SHERRY ROSENSTEIN,

      Plaintiffs,                     Case No.: 07-80903 CIV-MIDDLEBROOKS

v.

THE EDGE INVESTORS, L.P., a
foreign limited partnership,

      Defendant.
_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGEMENT [DE 86], DENYING AS MOOT [DE 90]

THIS CAUSE comes before the Court on Defendant, The Edge Investors, L.P.'s ("Defendant") Amended Motion for Summary Judgment [DE 86] against the claims of Kenneth J. Colson; Joanne Conti and Thomas Simone; Mark D. Rosenstein and Sherry Rosenstein; and Steven Seldin and Celeste Seldin (collectively, the "Plaintiffs") and a statement of material facts in support of the motion [DE 87], filed on April 8, 2008. Plaintiffs filed a memorandum in opposition to defendant's amended motion for summary judgment [DE 102], a statement of material facts in opposition to defendants motion [DE 103], and appendices to the same [DE 104, 105] on April 18, 2008. Defendant filed notices of supplemental authority for its motion for summary judgment [DE 112, 113, 116, 118, 120, 127, 129, 131, and 133], and plaintiffs filed responses [DE 114, 115, 117, 119, 122, 123, 128, 130, 132, and 134].[1] I have reviewed the record and am advised in the premises.

---

[1]The Court is aware that in recent years, suits such as this have become increasingly common, and therefore, this area of law is in the process of being developed and refined by the Courts. However, such ongoing developments should not trigger a notice-response cycle as it has in this case. Filing a notice of supplemental authority to inform the Court of a new judicial opinion that has been issued is appropriate, but it is an improper occasion to argue outside the pleadings. And, it certainly does nothing to promote a speedy resolution of the Parties' matters.

I.    **Factual Background**

On or about July 7, 9, and 16, 2005, Plaintiffs Conti, Seldin, Colson, and Rosenstein, respectively, and as the Plaintiffs, entered into identical Purchase Agreements (the "Contract") with Defendant, as the Seller, for the sale and purchase of preconstruction condominium units in the proposed Defendant Condominium No. One ("the Units"). Pursuant to paragraph 7 of the Contracts, Defendant agreed to "substantially complete construction of the Unit" by no later than two (2) years from the date Plaintiffs signed the Contract, "subject, however, only to delays caused by matters which are legally recognized as defenses to Contract actions." That is, Defendant was required to substantially complete construction of the Units, by July 7, 2007 for Plaintiffs Conti, by July 9, 2007 for Plaintiffs Seldin and Colson, and by July 16, 2007 for Plaintiffs Rosenstein, pursuant to their respective contracts.

Plaintiffs bring three counts against Defendant. First, Plaintiffs allege that Defendant breached the Contracts by failing to complete construction of the Unit with two (2) years from the date on which Plaintiffs signed the Contract. Defendant responds that it substantially completed construction of the Units in accordance with the terms of the Contract within two years and/or was otherwise excused from such deadline based upon force majeure, and that the Plaintiffs' purported revocation was untimely.

Second, Plaintiffs allege that Defendant violated the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, *et. seq.* ("ILSA"). More particularly, Plaintiffs allege that the sale of the Units was not exempt under ILSA as Defendant failed to unconditionally commit to complete construction of the Units within two years in compliance with 15 U.S.C. § 1702(a)(2), which states:

3

Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to . . . the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years.

15 U.S.C. § 1702(a)(2).

Plaintiffs accordingly allege that the sale of the Units were subject to, and Defendant was required to comply with, the provisions of 15 U.S.C. § 1703. Defendant does not dispute that it did not comply with 15 U.S.C. § 1703. Rather, Defendant alleges that it was not required to comply with the same because the sale of the Units is exempt from the disclosure requirements of the ILSA because the Contracts allegedly provide for an unconditional commitment to complete construction of the Units within two years.

Finally, Plaintiffs Seldin, Colson, and Rosenstein allege that the revisions to the offering documents issued by Defendant, after the execution of the Contracts, were material and adverse to Plaintiffs in violation of Florida's Condominium Act, Fla. Stat. § 718.503(1)(a), which states that contracts must include the following language, in relevant part:

THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.

Fla. Stat. § 718.503(1)(a)1.

Defendants contend that any revisions to the offering documents were not material and/or adverse to Plaintiffs.

Plaintiffs argue that there are material facts in dispute precluding summary judgment.

4

However, the Parties do not dispute the content or authenticity of the Contracts, and they do not dispute several other key facts and dates as set forth in the Join Pretrial Stipulation [DE 94]. Furthermore, although it was later stricken, Plaintiffs also filed a motion for summary judgment, so at one point in the proceedings, they too agreed that there were no material facts in dispute. Based on the foregoing and my review of the record, I find that there are no material facts in dispute to preclude summary judgment as to all counts. The following facts are not disputed by the parties.

Paragraph 33 of the Purchase Agreements defines substantial completion for the purpose of paragraph 7:

> Substantial Completion. Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that term will be understood to be complete or substantially complete when so complete or substantially complete in Seller's opinion. Notwithstanding the foregoing, however, neither the Unit nor the Building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased. The Unit (and such portion of the Building) will be considered so useable if the Unit is ready for occupancy and had all necessary and customary utilities extended to it. Other units (and other portion of the building) may not necessarily be so complete and useable.

Paragraph 26 of the Purchase Agreements, later called the "savings clause" states:

> The following sentence will supersede and take precedence over anything else in this Agreement, which is in conflict with it: If any provisions serve to: (1) limit or qualify Seller's substantial completion obligations as stated in Section 7, or (2) limit Buyer's remedies in the event that such obligations are breached, or (3) grant Seller an impermissible grace period, and such limitations or qualifications are not permitted if the exemption of this sale from the Interstate Land Sales Full Disclosure Act pursuant to 15 U.S.C. § 1702(a)(2) is to apply or this Agreement is to otherwise be fully enforceable, then all of those provisions are hereby stricken and made null and void as if never a part of this Agreement. For purposes of this paragraph only, the words "this Agreement" include in their meaning the Condominium Documents.

Pursuant to their respective contracts, Defendant was required to substantially complete construction of the Units, by July 7, 2007, for Plaintiff Conti; by July 9, 2007, for Plaintiffs Seldin and Colson; and by July 16, 2007, for Plaintiffs Rosenstein. It is not disputed that Defendant was issued a certificate of conditional occupancy on June 27, 2007, and a second certificate of conditional occupancy on July 27, 2007. Defendant then obtained a permanent certificate of occupancy for the subject property on August 27, 2007. The building department records for the City of West Palm Beach reflect that Defendant did not obtain its first "pass" inspection until July 20, 2007, and failed to obtain the final certificate of occupancy on June 26, 2007, June 27, 2007, July 16, 2007, and August 8, 2007 inspections.

Pursuant to paragraph 7 of the Contracts, Defendant agreed to substantially complete construction of the Unit by no later than two (2) years from the date plaintiffs signed the contract subject, however, only to delays caused by matters which are legally recognized as defenses to contract actions.

Defendant alleges that hurricane Wilma, which struck Florida on October 24, 2005, constitutes an excuse for any delay in the completion of the subject property due to a shortage of labor and materials caused by the hurricane. It is not disputed that as of October 24, 2005, no above-ground construction (other than the pouring of concrete) had commenced on the subject property.

Furthermore, it is not disputed that at no time prior to Plaintiffs' signing the Contracts was a statement of record submitted or filed by Defendant with HUD, and at no time prior to the Plaintiffs' signing the Contracts was a property report ever provided to Plaintiffs. There is no provision on the face of the Contracts informing Plaintiffs of their right to revoke the Contracts

6

within two (2) years from the signing thereof in the event Defendant fails to timely provide Plaintiffs such property report.

## II.     Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1719, and 28 U.S.C. § 1367(a).

## III.    Legal Standard and Choice of Law

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In applying this standard, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Arrington v. Cobb County*, 139 F.3d 865, 871 (11th Cir. 1998); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The non-moving party, however, bears the burden of coming forward with evidence of each essential element of their claims, such that a reasonable jury could find in their favor. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). The non-moving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby,*

7

*Inc.*, 477 U.S. 242, 252 (1986). Further, conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment. *See Earley*, 907 F.2d at 1081. The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See Celotex*, 477 U.S. at 322-3.

The parties agree that Florida law applies to the common law breach of contract claim.

## IV.    Analysis

As stated above, the Plaintiffs put forth three claims in order to rescind their Purchase Agreements. First, the Plaintiffs allege that Defendant failed to make certain disclosures pursuant to the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, et. seq. ("ILSA"). Second, the Plaintiffs[2] allege that Defendant made adverse and material changes to the condominium offering documents in violation of Fla. Stat. § 718.503(1)(a) (the "FCA"). Third, the Plaintiffs claim Defendant breached the Purchase Agreements because Defendant failed to complete construction within the agreed two year time period. I will review these claims in turn.

### A.    Violation of the ILSA

The Parties agree that the Units are subdivisions under 15 U.S.C. § 1701(3), and thus subject to various ILSA regulations. The Plaintiffs allege that Defendant failed to unconditionally commit to substantially complete construction of the Plaintiffs' Units within two years in compliance with

---

[2]Plaintiffs Ms. Conti and Mr. Simone do not allege a claim under the Florida Condominium Act.

8

15 U.S.C. § 1703. In addition, the Plaintiffs allege that Defendant violated § 1703(b) for failing to clearly provide the Buyer's right to revoke the Purchase Agreements at their option until midnight of the seventh day following the signing of the Contract. Further, the Plaintiffs allege that Defendant violated § 1703(c) for failing to clearly provide for the Plaintiffs' right to revoke the Purchase Agreement within two years from their signing of the same, due to Defendant's alleged failure to timely furnish the Plaintiffs with a property report. Finally, the Plaintiffs allege that Defendant violated § 1703(d)(2) by failure to provide for notice of a default or breach by Plaintiffs along with a twenty-day curative period to remedy the Purchase Agreement prior to Defendant calling the Plaintiffs in default or breach.

ILSA requires the developer to provide various contractual provisions and documents for the purchaser:

(d) Additional authority for revocation of nonexempt contract or agreement at option of purchaser or lessee; time limit; applicability

Any contract or agreement which is for the sale or lease of a lot *not exempt under section 1702* of this title and which does not provide--

(1) a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the lot is located;

(2) that, in the event of a default or breach of the contract or agreement by the purchaser or lessee, the seller or lessor (or successor thereof) will provide the purchaser or lessee with written notice of such default or breach and of the opportunity, which shall be given such purchaser or lessee, to remedy such default or breach within twenty days after the date of the receipt of such notice; and

(3) that, if the purchaser or lessee loses rights and interest in the lot as a result of a default or breach of the contract or agreement which occurs after the purchaser or lessee has paid 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, the seller or lessor (or successor thereof) shall refund to such purchaser or lessee any amount which remains after subtracting (A) 15

per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, or the amount of damages incurred by the seller or lessor (or successor thereof) as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser or lessee with respect to the purchase price of the lot, excluding any interest paid under the contract or agreement,

may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement. This subsection shall not apply to the sale of a lot for which, within one hundred and eighty days after the signing of the sales contract, the purchaser receives a warranty deed (or, where such deed is not commonly used in the jurisdiction where the lot is located, a deed or grant that warrants at least that the grantor has not conveyed the lot to another person and that the lot is free from encumbrances made by the grantor or any other person claiming by, through, or under him or her).

15 U.S.C. § 1703(d).

The section of the statute that provides an exception, § 1702, states:

Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to--

(2) the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years;

15 U.S.C. § 1702(a)(2).

Paragraph 7 of Contract between the parties provides, in part, that:

Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than two (2) years from the date Buyer signs this Agreement, subject, however, only to delays caused by matter which are legally recognized as defenses to contract actions in the jurisdiction where the Building is being erected (the "Outside Date").

ILSA is "an antifraud statute utilizing disclosure as its primary tool," enacted to "protect purchasers from unscrupulous sales of undeveloped home sites." *Winter v. Hollingsworth Properties*, 777 F.2d 1444, 1447 (11th Cir. 1985). ILSA makes it unlawful for a developer or agent to make use of interstate commerce to sell or lease any lot unless a printed property report, meeting certain requirements, has been furnished to a purchaser before the signing of the contract. 15 U.S.C. §

10

1703(a)(1)(B). Where a developer fails to provide the property report prior to the purchaser signing a contract, the contract may be revoked at the option of the purchaser within two years from the date of signing. § 1703(c). However, sales of "improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller [] to erect such a building thereon within a period of two years" are exempt from ILSA's coverage. § 1702(a)(2).

ILSA, a federal statute, is interpreted under federal law, and the Department of Housing and Urban Development's ("HUD") regulations are entitled to great deference. *Winter v. Hollingsworth Properties*, 777 F.2d 1444, 1448 (11th Cir. 1985). Whether a contract "obligates" a seller to erect a building within two years is a question of state contract law. *Samara Dev. Corp. v. Marlow*, 556 So. 2d 1097, 1099-1100 (Fla. 1990).

HUD has provided guidelines for exemptions available under ILSA. Guidelines for Exemptions under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13596 (Mar. 27, 1996) [hereinafter ILSA Guidelines]. HUD's interpretation of what constitutes an obligation to construct relies on general principles of contract law. ILSA Guidelines, 61 Fed. Reg. 13596, 13599. HUD's guidelines also state that the "contract must not allow nonperformance by the seller at the seller's discretion," because such an obligation is "not an obligation in reality." ILSA Guidelines, 61 Fed. Reg. 13596, 13603. Further, HUD provides that

> [c]ontract provisions which allow for nonperformance or for delays of construction completion beyond the two-year period are acceptable if such provisions are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected. For example, provisions to allow time extensions for events or occurrences such as acts of God, casualty losses or material shortages are generally

11

permissible.

*Id.*

The ILSA Guidelines further provide that

Although the factual circumstances upon which nonperformance or a delay in performance is based may vary from transaction to transaction, as a general rule delay or nonperformance must be based on grounds cognizable in contract law such as impossibility or frustration and on events which are beyond the seller's reasonable control.

*Id.*

In addressing ILSA, the Supreme Court of Florida has stated that, "in order for the developer to be 'obligated' to complete the building within two years, the obligation must be unrestricted and the contract must not limit the purchaser's right to seek performance *or* damages." *Samara Dev. Corp.*, 556 So. 2d at 1100.

### 1.     Force Majeure Clause

District courts that have examined this issue of the *force majeure* clause and are divided. *Compare Harvey v. Lake Buena Vista Resort, LLC*, 2008 U.S. Dist. LEXIS 33190 (M.D. Fla. Apr. 22, 2008) (holding that developer did not qualify for ILSA exemption where contract's *force majeure* clause expanded defenses beyond those acceptable under Florida law) *and Stein v. Paradigm Mirsol, LLC*, 2008 U.S. Dist. LEXIS 9073 (M.D. Fla. Feb. 7, 2008) (same), *with Kamel v. Kenco/The Oaks at Boca Raton, LP*, 2008 U.S. Dist. LEXIS 42467 (S.D. Fla. May 29, 2008) (finding a contract's *force majeure* clause qualified developer for ILSA exemption because the application of the defense of impossibility of performance is a fact-specific inquiry and the contract, while listing factual circumstances that could give rise to the defense of impossibility of performance, only conditioned non-performance on impossibility) *and Rondini v. Evernia Properties, LLP*, No. 07-81077-CIV-

12

HURLEY/HOPKINS (S.D. Fla. Feb. 13, 2008) (finding that some conditions placed on defendant's obligation to build did not nullify the applicability of the ILSA exemption).

I find that a developer may place some conditions on an obligation to build and still qualify for the statutory exemption. Further, Plaintiffs rely upon *G.L. Homes of Lake Charleston Associates, Ltd. v. Arbid*, No. AP 95-3496 AY (Fla. Cir. Ct. Aug. 12, 1996). In *Arbid*, the court held that "labor and material shortages categorically do not give rise to the defense of impossibility or frustration of purpose." *Id.* at 4. The Honorable Kenneth A. Marra recently held that a *force majeure* clause similar to the one at issue in this case only conditioned completion upon impossibility of performance. *Kamel*, 2008 U.S. Dist. Dist. LEXIS 42467 at *12. Judge Marra acknowledged that he was on the panel of judges that issued the ruling in *Arbid* but determined that the *Arbid* court's reasoning was erroneous and declined to follow its holding. *Id.* This Court agrees with the *Kamel* decision.

The clause at issue limits Defendant's defenses to those recognized by Florida law. That is the only condition Defendant placed on its obligation to complete construction. The clause contemplates only legally-recognized defenses in Florida and, in this case, does not expand the definition of the defense such that it made Defendant's obligation to finish illusory. Therefore, I find that the conditions placed on the agreement does not nullify the applicability of the § 1702(a)(2) exemption. Accordingly, the agreement is exempt from the requirements of ILSA.

Although these issues are not raised in Plaintiffs' Complaint [DE 18], in Plaintiffs' response in opposition to Defendant's motion for summary judgment [DE 102], Plaintiffs raise new reasons as to why Defendant's promise to complete the buyer's unit was illusory in addition to the *force majeure* clause mentioned in the complaint. The first new issues relates to the Contract provisions

13

that relate to obtaining a temporary certificate of occupancy ("TCO"). From Plaintiffs' pleadings, I have gleaned that Plaintiffs' logic is such that Defendant merely promised to complete the units insofar as the Units could obtain a temporary certificate of occupancy ("TCO"), and the award of a TCO falls short of the completion of the units required to meet the exemption under § 1702(a)(2), thereby making the promise to actually complete the Units illusory. Second, Plaintiffs contend that because the contract does not allow for a lis pendens, it makes specific performance unavailable to them, thus making the promise of complete construction illusory. Finally, Plaintiffs argue that the "savings clause" contained in the Contracts is in place "so Defendant could evade the [ILSA's] disclosure requirements and to require Plaintiffs to waive Defendant's compliance with the Act . . . [a]s such, [it] is void and cannot cure Defendant's failure to unconditionally comply with the act." [DE 102, p. 21].

I have addressed these three arguments made against the same defendant, based on the same contract, at the motion to dismiss stage in *Pilato v. Defendant Investors, L.P.*, 08-80796-CIV-MIDDLEBROOKS/JOHNSON. In that case, I dismissed the ILSA claim based on the motion to dismiss standard – the claims failed on dispositive issues of law. As such, even though this case is at the summary judgment stage (a motion to dismiss was not brought against the amended complaint), it is not necessary to address the proof, or failure of proof, of the elements of the ILSA claim as is normally required at the summary judgment stage because Plaintiffs have not stated a claim as a matter of law. Therefore, in this Order, I will reiterate my reasoning in dismissing Plaintiffs' claims in *Pilato v. Defendant Investors, L.P.*, 08-80796-CIV-MIDDLEBROOKS/JOHNSON.

14

## 2.    Temporary Certificate of Occupancy Issue

With regard to the TCO complaint, the provisions in the Contract are consistent with HUD guidelines, which require a unit to be "ready for occupancy" in order "to be considered complete." See Supplemental Information to Part 1710: Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, available at **http://www.hud.gov/offices/hsg/sfh/ils/ilsexemp.cfm**. As such, Plaintiffs have failed to plead in any way that using an issuance of a temporary certificate of occupancy as a proxy for substantial completion is not an unconditional commitment to complete construction. Furthermore, even examining the contract outside the perview of the HUD guidelines, Plaintiffs' claim contradicts itself. Section 307.5 of the South Florida Building Code makes no distinction between temporary and permanent certificates of occupancy, and in relevant part provides for a temporary certificate of occupancy:

> (a) A Temporary and/or Partial Certificate of Occupancy may be issued by the Building Official for the temporary use of a portion of a building, providing the portion of the Building to be occupied is clearly designated and all Code provisions ... relating to public safety have been met and approved by the Building Official.
> Section 307.5 of the South Florida Building Code

A TCO, by definition, is issued to properties that are substantially complete. Therefore, the promise is not illusory and this part of the claim fails because it defeats itself.

## 3.    The Lis Pendens Issue

With regard to Plaintiffs' lis pendens argument, Plaintiffs allege that because the contract does not allow for a lis pendens, it makes specific performance unavailable to them, thus making the promise of complete construction illusory. While a lis pendens certainly goes far to protect a plaintiff's

15

interest in the property, and certainly warns potential purchasers that the property is encumbered, being awarded a lis pendens is not the same as specific performance. It does not give the Plaintiff actual possession and ownership of the property that specific performance would render. In fact, a lis pendens does not, in itself, prevent the property from being bought from a third party. *See Haisfield v. ACP Florida Holdings, Inc.*, 629 So.2d 963, 965 (Fla. 4th DCA 1993)("a lis pendens technically does not prevent the sale of the property, nor is it a lien on the property"). Finally, "even in the absence of a recorded lis pendens, if the third party purchaser takes title to property with awareness of a prior interest, evidenced . . . by the pending litigation, such notice bars the third party's claim to the property." *Westburne Supply, Inc. v. Community Villas Partners, Ld.*, 508 So.2d 431, 435 (Fla. 1st DCA 1987). Therefore, the availability of specific performance does not rise or fall on the availability of obtaining a lis pendens. I cannot accept the argument that the promise is illusory merely because the Contract does not allow Plaintiffs to obtain a lis pendens.

### 4.    The "Savings Clause" Issue

Finally, with regard to "savings clause" or "severability clause," which indicates the parties' intent that the ILSA exemption apply, Plaintiffs have not stated a claim. Severability clauses are recognized and enforceable under Florida law. *See Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005). Here, the language contained in the "severability clause" portion of the Contract does not constitute an impermissible waiver, nor does it reveal an intent solely to evade ILSA's disclosure requirements. Under Florida law, a court should construe the provisions of a contract from the words of the entire contract. *Sugar Cane Growers Coop., Inc. v. Pinnock*, 735 So. 2d 530, 535 (Fla. 4th DCA 1999). Courts should endeavor to reconcile apparent inconsistencies.

*Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979). Reading the Contract as a whole and giving all language effect, the Court finds that the Contract contains a two-year completion obligation that is not illusory and, accordingly, is eligible for the ILSA exemption. As such, Defendants are entitled to summary judgment against Plaintiffs as to Count I of the Complaint. Therefore, Plaintiffs are entitled to summary judgment on the ILSA claim.

**B.     Violation of Florida's Condominium Act, Fla. Stat. § 718.503(1)(a)**

The Plaintiffs claim the Amended Offering Documents, revised on July 6, 2007, contain three modifications that were material and adverse to them, in violation of Fla. Stat. § 718.503(1)(a). The first change was to paragraph 15: Defendant added a provision that requires non-binding arbitration of disputes between members of the condominium association and the association, or among members. The provision also contains an attorneys' fee shifting clause to the prevailing party. The second change was to paragraph 13.7: which the Plaintiffs allege revoked Defendant's obligation to pay assessments on the units owed by Defendant, for a period "potentially up to four years." The third change was to paragraph 17: after the first year, unit owners are no longer allowed "to vote to continue to not provide or collect for reserves as it did before the revisions. In other words, collection of reserves is now mandatory after the first year and it is no longer an option for the homeowners to keep the assessments free of reserves." [DE 3, ¶ 38]. The Plaintiffs allege that this will result in an approximately 300% increased cost per year to the Plaintiffs.

The Plaintiffs claim that within fifteen days after the date of their receipt of the revised offering documents, the Plaintiffs delivered written notice of their intention to cancel the Purchase Agreement, pursuant to Fla. Stat. § 718.503. Section 718.503(1)(a)1 allows a buyer to cancel the

17

purchase within 15 days of receiving notice of a material adverse change.

Under Florida law, "an objective test is appropriate to decide whether an amendment amounts to a "material" alteration or modification of an offering under section 718.503(1)(a) - would a reasonable buyer under the purchase agreement find the change to be so significant that it would alter the buyer's decision to enter into the contract?" *D & T Properties, Inc v. Marina Grande Assoc. Ltd.*, 985 So.2d 43, 49 (Fla. 4th DCA 2008).

### 1.   Arbitration and Attorneys Fees Clause

Defendant contends that the arbitration clause was added in order to comply with Fla. State, Section 44.103 (2007)[3], which provided that a party's request for a trial de novo triggers a fee shifting provision pursuant to which a requesting party who fails to secure a more favorable result at trial than obtained at arbitration is reasonable for the opposing party's reasonable attorneys fees and costs.  In addition, Defendant argues that the addition of the non binding arbitration clause was required to bring the Contract into compliance with Fla. Stat. § 718.1255(4). It is worthwhile at this point to set forth both § 718.125(4) and § 718.1255(3):

> (3) Legislative findings.--
>
> > (a) The Legislature finds that unit owners are frequently at a disadvantage when litigating against an association. Specifically, a condominium association, with its statutory assessment authority, is often more able to bear the costs and expenses of litigation than the unit owner who must rely on his or her own financial resources to satisfy the costs of litigation against the association.
> >
> > (b) The Legislature finds that alternative dispute resolution has been making

---

[3]Fla. Stat. Section 44.103 has since been amended, and the amendment was effective October 1, 2007.

> progress in reducing court dockets and trials and in offering a more efficient, cost-effective option to court litigation. However, the Legislature also finds that alternative dispute resolution should not be used as a mechanism to encourage the filing of frivolous or nuisance suits.
>
> (c) There exists a need to develop a flexible means of alternative dispute resolution that directs disputes to the most efficient means of resolution.
>
> (d) The high cost and significant delay of circuit court litigation faced by unit owners in the state can be alleviated by requiring nonbinding arbitration and mediation in appropriate cases, thereby reducing delay and attorney's fees while preserving the right of either party to have its case heard by a jury, if applicable, in a court of law.

(4) Mandatory nonbinding arbitration and mediation of disputes.--The Division of Florida Condominiums, Timeshares, and Mobile Homes of the Department of Business and Professional Regulation shall employ full-time attorneys to act as arbitrators to conduct the arbitration hearings provided by this chapter. The division may also certify attorneys who are not employed by the division to act as arbitrators to conduct the arbitration hearings provided by this section. No person may be employed by the department as a full-time arbitrator unless he or she is a member in good standing of The Florida Bar. The department shall adopt rules of procedure to govern such arbitration hearings including mediation incident thereto. The decision of an arbitrator shall be final; however, a decision shall not be deemed final agency action. Nothing in this provision shall be construed to foreclose parties from proceeding in a trial de novo unless the parties have agreed that the arbitration is binding. If judicial proceedings are initiated, the final decision of the arbitrator shall be admissible in evidence in the trial de novo.

Sections 718.1255(3) and (4).

As such, the Florida Legislature enacted this law to benefit the unit owners/purchasers for all of the reasons set forth above. While Plaintiffs contend that this would essentially require them to litigate twice – once in arbitration and once in court – such a result is unlikely. The statute specifically says that "[i]f judicial proceedings are initiated, the final decision of the arbitrator shall be admissible in evidence in the trial de novo." Section 718.1255(4), Fla. Stat. Therefore, the action comes to the Court with both a record and a ruling to review, obviating the need to re-litigate many of the elements of the case who's issues have been refined already.

19

Plaintiffs claim that the attorneys fees and costs shifting provisions are adverse to them, however; in reality, they are only adverse to any party who brings a claim without merit. Finally, Defendants point out that as a result of the statutes quoted supra, "whatever the Initial Offering Documents said, [Plaintiffs] would have been required to engage in alternative dispute resolution for these types of disputes," regardless whether the documents were changed to reflect that fact. In other words, Plaintiff already were required by law to arbitrate. Therefore, as a matter of law, there was no adverse change to the condominium documents with the addition of this provision.

### 2.    Developer's Budget Guaranty in Lieu of Paying Assessments

Second, paragraph 13.7 of the revised Declaration added a new provision modifying Defendant's liability for assessments. Paragraph 13.7 of the revised Declaration says:

> 13.7 Developer's Liability For Assessments. During the period from the date of the recording of this Declaration until the earlier of the following dates (the "Guarantee Expiration Date"): (a) the last day of the twelfth (12th) full calendar month following the recording of the Declaration, or (b) the date that control of the Association is transferred to Unit Owners other than the Developer as provided in the By-Laws and the Act, the developer shall not be obligated to pay the share of Common Expenses and Assessments attributable to the Units owned by the Developer, provided: (I) that the regular Assessments for Common Expenses imposed on each Unit Owner other than the Developer prior to the Guarantee Expiration Date shall not increase during such period over the amounts set forth on Exhibit "6" attached hereto; and (ii) that the Developer shall be obligated to pay any amount of Common Expenses actually incurred during such period and not produced by the Assessments a the guaranteed levels receivable from the other Unit Owners. After the Guarantee Expiration Date, the Developer shall have the option in its sole discretion of extending the guarantee for eight (8) additional six (6) month periods, or paying the share of Common Expenses and Assessments attributable to Units it then owns . . .

Accordingly to the Plaintiffs, this change "dis-obliged [Defendant] from paying assessments on the units owned by [Defendant] for a period potentially up to four years. [DE 102, p. 29]. However,

20

Defendant must also make up any shortfall in expenses over and above the assessments collected from the other purchaser unit owners. *Id.* The Plaintiffs contend that such a change will inevitably lead to a lower level of upkeep and services for the building. The Plaintiffs say that this allows Defendant to benefit if the assessments remain "fixed," causing the shortfall to decrease, thereby decreasing Defendant's obligations. In addition, if there is an "extraordinary financial event," Defendant can pass through those costs to the Plaintiffs, so the Plaintiffs "get all of the downside risk but none of the upside benefit with respect to the expenses of operating the Condominium."

The Plaintiffs' presumption that Defendant will change quality of the services offered to the Buyer's detriment in order to save money is speculative at best, and does not represent an actual change. In fact, if the Defendant is still in control of the services offered (pre-turnover), it would appear to be in Defendant's best interest to maintain a high level of services in order to attract more purchasers. Furthermore, even if it is true that Defendant benefits from this change, in that it eliminates some of Defendant's "downside risk," a change to Defendant's benefit does not necessarily equal a change to the Buyer's detriment, and Plaintiffs have failed to support with evidence the allegation that the change is, in fact, to their detriment.

Additionally, the Plaintiffs allege that this change means that the assessments "which previously were subject to decrease" are now not subject to decrease "for a period of time potentially as long as five years." The changed circumstances alleged by the Plaintiffs, that they are now no longer able to benefit from a potential *decrease* in assessments is also a highly speculative adverse change. The fact that a decrease in assessments *may* have occurred under the previous documents and now cannot happen under the changed documents is not an injury in fact, but a highly

21

speculative future event.

Finally, in *D & T Properties,* 985 So.2d at 50, the Court held that a $90 monthly increase in assessments, which represented a mere 18.35% increase on the original budget of $490.37, was "not a material one that gave rise to the buyer's right to cancel under § 718.503(1)(a)." The *D & T Properties* Court contrasted this change to that in *BB Landmark, Inc. v. Haber,* 619 So.2d 448 (Fla. 3d DCA 1993), in which the Court held that a 65% increase in "extras" was material under the statute. Now, Plaintiffs ask this Court to rule that a 0% change in assessments – which may or may not cause the Defendant to seek a cut back on the level of service (a claim for which Plaintiffs put forth no proof) – is a material and adverse change under the statute. As noted by the *D & T Properties* Court, "[w]hile the statute does not exclusively tie the materiality of an alteration or modification to the purchase price, such a consideration is a proper part of the materiality equation." *Id.* At 50.

A reasonable person would approve a fixed price for this period, even in the face of the risk Plaintiffs envision to the quality of upkeep. Such a freeze on assessments also removes the risk to the Plaintiffs and other purchasers that such assessments escalate during the period, and end up costing the Plaintiffs and other purchasers more money. That is a risk a reasonable person may agree to avoid. As such, this change is not material and adverse under the statute.[4]

---

[4] This provision also tracks Fla. Stat. Section 718.116(9)(a)(2), which states:

(9)(a) A unit owner may not be excused from payment of the unit owner's share of common expenses unless all other unit owners are likewise proportionately excluded from payment, except as provided in subsection (1) and in the following cases:

2. A developer who owns condominium units, and who is offering the units for sale, may be excused from payment of assessments against those unsold units for

### 3.     The Reserve Change

The third change is to paragraph 17 of the Prospectus and Purchase Contract, and it revised

the manner in which the assessments may be voted upon and imposed after the first year. Paragraph

17 states in part:

> It is intended that the Seller, as the sole Unit Owner upon the formation of the
> Condominium, will vote not to provide any reserves for the initial year of the
> Condominium Association. Thereafter, on an annual basis, a majority of the
> Condominium Association's members (which may include the Developer during the
> second fiscal year of the Association) may vote to continue not to provide any reserves
> in subsequent years. If an election is in fact made to waive reserves, the assessments
> per unit payable to the Condominium Association will be as set forth in the Estimated
> Operating Budged as "Assessments per Unit – Without Reserves". If no such election
> is made, the assessments per Unit payable to the Condominium Association will be
> as set forth in the Estimated Operating Budgets as "Assessments per Unit – With
> Reserves."

The Plaintiffs contend that "collection of reserves is now mandatory after the first year and

it is no longer an option for the Developer to keep the assessments free of reserves if the other unit

---

the period of time the developer has guaranteed to all purchasers or other unit
owners in the same condominium that assessments will not exceed a stated dollar
amount and that the developer will pay any common expenses that exceed the
guaranteed amount. Such guarantee may be stated in the purchase contract,
declaration, prospectus, or written agreement between the developer and a majority
of the unit owners other than the developer and may provide that, after the initial
guarantee period, the developer may extend the guarantee for one or more stated
periods. If a developer-controlled association has maintained all insurance
coverage required by s. 718.111(11)(a), common expenses incurred during a
guarantee period, as a result of a natural disaster or an act of God occurring during
the same guarantee period, which are not covered by the proceeds from such
insurance, may be assessed against all unit owners owning units on the date of such
natural disaster or act of God, and their successors and assigns, including the
developer with respect to units owned by the developer. Any such assessment shall
be in accordance with s. 718.115(2) or (4), as applicable.

Fla. Stat. § 718.116(9)(a)(2).

23

owners vote differently." [DE 102, p. 30]. The Plaintiffs allege that this would cause a 300% increase in their yearly cost. The Plaintiffs, as "purchaser[s] with a short term horizon . . . who were not purchasing to live there but rather as an investment . . . relied upon [Defendant's] ability as the developer to participate in those decisions and have control over keeping those assessment costs down." [DE 102, p. 31]. Therefore, the Plaintiffs believe that giving voting rights to the unit owners regarding assessments is against their interest because they initially relied Defendant's power over this issue due to their supposed aligned interests.

Under Florida law, "a buyer's motivation is irrelevant in deciding whether the buyer has the right to cancel under the statute . . . the buyer's right to cancel turns on whether the statutory test is satisfied, not on whether the buyer seeks 'to void the agreement due to the loss of resale value caused by a downturn in the real estate market.'" *D & T Properties, Inc v. Marina Grande Assoc. Ltd.*, 985 So.2d 43, 50 (Fla. 4th DCA 2008). That precept applies to this case: it involves contracts for the purchase and sale of real property, not a joint venture between the developer and the purchasers. Plaintiffs did not contract with Defendant to create a voting agreement.

Plaintiffs allege that the "net result" of this provision is to create an almost there-hundred percent cost increase per year to the Plaintiffs – the difference annually for assessments without reserves and assessments with reserves. [DE 102, p. 30-31]. However, the provision specifically states that the voting members "may vote to continue not to provide any reserves in subsequent years." Therefore, the potential change of adding reserves is completely speculative. And, as Plaintiffs suggest, the majority of unit owners may view the institution of reserves as a benefit and vote for it. Simply because it "increase[s] the costs of carry for the unit" for the investor owner [DE

102, p. 31], Florida law does not permit a subjective, individualized analysis of the purchaser's motivation. Instead, it requires an objective test – "would a reasonable buyer under the purchase agreement find the change to be so significant that it would alter the buyer's decision to enter into the contract?" Plaintiffs have failed to prove how a provision that gives the unit owners themselves a vote on whether or not to collect reserves after the first year would alter a reasonable buyer's decision to enter into a contract. Therefore, Defendant is entitled to judgment on the Florida Condominium Act claim as a matter of law.

### C.    Breach of Contract

Plaintiffs contend that Defendant violated paragraph 33, quoted *supra*, because the Units were "not physically habitable, usable, ready for occupancy or had necessary and customary utilities extended to it . . . within two years of [Plaintiff's] signing of the [Purchase Agreement]. [DE 18, ¶ 51].

Plaintiffs point out that paragraph 13 of the Contract provides as follows:

> . . . if the default alleged by Buyer is with respect to Seller's substantial completion obligation set forth in Section 7 [of the Contract], Seller shall not be entitled to the curative period described above to the extent that same would be deemed to extend Seller's completion obligation in a manner which would not be permitted if the exemption of this sale from the [ILSA] pursuant to [Section 1702(a)(2)] is to apply.

Under Florida law, a cause of action for breach of contract has three elements (1) a valid contract, (2) a material breach, and (3) damages. *See, e.g., Technical Packaging, Inc. v. Hanchett*, 992 So.2d 309, 313 (Fla. 2d DCA 2008).

As stated above, on June 27, 2007, Defendant was issued a certificate of conditional

occupancy. Defendant was required to substantially complete construction of the Units, by July 7, 2007, for Plaintiff Conti; by July 9, 2007, for Plaintiffs Seldin and Colson; and by July 16, 2007, for Plaintiffs Rosenstein. Defendant did not obtain a permanent certificate of occupancy for the subject property on August 27, 2007.

Plaintiffs state that this is a factual issue inappropriate for resolution at summary judgment. The issuance of the TCO (and the specific requirements for issuance of a TCO), along with the list of things that remained for Defendant to finish after the issuance of the TCO are a part of the record. The record gives an exhaustively detailed and precise picture of what had been completed as of June 27, 2009, and what remained to be completed by August 27, 2007. Such a voluminous catalogue is not necessary to be duplicated in this Order. After reviewing the record, it is hard to imagine that any more facts could be presented to the trier of fact on the state of the unit and building's completion.

The express terms of the contract control, and Plaintiffs cannot argue around its plain meaning. Paragraph 7 of the Contract states:

> Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than two (2) years from the date Buyer signs this Agreement, subject, however, only to delays caused by matter which are legally recognized as defenses to contract actions in the jurisdiction where the Building is being erected (the "Outside Date").

As stated above, Paragraph 33 of the Purchase Agreements defines substantial completion for the purpose of paragraph 7:

> <u>Substantial Completion.</u> Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that term will be understood to be complete or substantially complete when so complete or substantially complete in Seller's opinion. Notwithstanding the foregoing, however, neither the Unit nor the Building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the

building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased. The Unit (and such portion of the Building) will be considered so useable if the Unit is ready for occupancy and had all necessary and customary utilities extended to it. Other units (and other portion of the building) may not necessarily be so complete and useable.

By the two year completion deadline, Plaintiffs do not dispute, and the record supports that (1) the units were physically habitable; (2) the units were ready for occupancy; and (3) the units had all the necessary and customary utilities extended to it. Plaintiffs attempt to argue that the units were not usable "for the purpose for which the Unit was purchased," because they did not have the permanent certificates of occupancy. However, Plaintiffs can point to nothing that prohibited their use and enjoyment of the Units as they waited for the permanent certificates of occupancy, and Plaintiffs point to nothing in the contract that supports their contention that the express purpose was to obtain a permanent certificate of occupancy. This argument is without merit, because, as Plaintiffs remind the Court, "when a contract is clear and ambiguous, the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls." *Liberty Mutual Ins. Co. v. Aventura Engineering & Construction Corp.,* 2008 WL 420031, * 14 (S.D. Fla. 2008).

The language of the contract only requires "substantial" completion. In addition to the way the contract itself defines the term, the common meaning of "substantial" is "being largely but not wholly that which is specified." See Merriam-Webster's Online Dictionary, **http://www.merriam-webster.com/dictionary/substantial**. Therefore, Plaintiffs' contention that "substantial completion" means the entire completion as required for a permanent certificate of occupancy is contrary to the terms of the contract itself, which require less than that by definition.

27

The plain language of the contract requires substantial completion, and the record unambiguously supports the fact that the units were substantially complete within the two-year period, therefore Defendant is entitled to judgment as a matter of law on the breach of contract claim.

Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendant's motion for summary judgment [DE 86] is GRANTED. Judgment is awarded in favor of Defendant and against Plaintiff as to ALL counts of Plaintiff's Complaint. The Clerk shall CLOSE this case. It is further

ORDERED AND ADJUDGED that Plaintiff's motion for an extension of time to file a reply [DE 90] is DENIED AS MOOT.

DONE AND ORDERED in chambers in West Palm Beach, Florida, this 30th day of March 2009.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

copies to counsel of record

28